IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JANET D. CULLIVER WHITEHEAD,[1] ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 2:19-CV-914-KFP |
| ) | |
| ANDREW SAUL, ) | |
| Commissioner, Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

## I.     INTRODUCTION

Plaintiff Janet D. Culliver Whitehead filed a Title II application for a period of disability and disability insurance benefits on September 15, 2016, alleging disability beginning on August 29, 2016.[2] R. 17, 160–61. The application was denied at the initial administrative level. Plaintiff then requested and received a hearing before an Administrative Law Judge on May 14, 2018. R. 17, 64–78, 102–59. Following the hearing, the ALJ issued an unfavorable decision, and the Appeals Council denied Plaintiff's request for review on October 17, 2019. R. 1–8. The ALJ's decision consequently became the final decision of the Commissioner of Social Security. *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The case is now before the Court for review of that decision under 42

---

[1] According to Plaintiff's brief and testimony at the hearing before the ALJ, Plaintiff got married between the application date and the hearing date, and Janet D. Culliver Whitehead is her current name.
[2] At the hearing, Plaintiff submitted a "Request to Amend the Alleged Onset Date" requesting that the ALJ amend the disability onset date to begin on June 1, 2016. R. 17, 181.

U.S.C. § 405(g). Pursuant to 28 U.S.C. § 636(c), both parties have consented to jurisdiction of the undersigned United States Magistrate Judge. Docs. 10, 11. After careful scrutiny of the record and the parties' briefs, the Court AFFIRMS the Commissioner's decision.

## II.   STANDARD OF REVIEW

The Court's review of the Commissioner's decision is a limited one. The Court's sole function is to determine whether the ALJ's opinion is supported by substantial evidence and whether the proper legal standards were applied. *See Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"The Social Security Act mandates that 'findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.'" *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting 42 U.S.C. §405(g)). Thus, this Court must find the Commissioner's decision conclusive if it is supported by substantial evidence. *Graham v. Apfel,* 129 F.3d 1420, 1422 (11th Cir. 1997). Substantial evidence is more than a scintilla—the evidence must do more than merely create a suspicion of the existence of a fact and must include relevant evidence that a reasonable person would accept as adequate to support the conclusion. *Lewis v. Callahan,* 125 F.3d 1436, 1440 (11th Cir. 1997) (citing *Richardson v. Perales,* 402 U.S. 389 (1971)); *Foote,* 67 F.3d at 1560 (citing *Walden v. Schweiker,* 672 F.2d 835, 838 (11th Cir. 1982)).

If the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the evidence preponderates against the Commissioner's findings. *Ellison v.*

*Barnhart,* 355 F.3d 1272, 1275 (11th Cir. 2003); *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (quoting *MacGregor v. Bowen,* 786 F.2d 1050, 1053 (11th Cir. 1986)). The Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote,* 67 F.3d at 1560 (citing *Chester*, 792 F.2d at 131). The Court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," but rather it "must defer to the Commissioner's decision if it is supported by substantial evidence*." Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996) (quoting *Bloodsworth*, 703 F.2d at 1239).

The Court will also reverse a Commissioner's decision on plenary review if the decision applies incorrect law,or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan,* 936 F.2d 1143, 1145 (11th Cir. 1991)). There is no presumption that the Commissioner's conclusions of law are valid. *Id*.; *Brown v. Sullivan,* 921 F.2d 1233, 1236 (11th Cir. 1991) (quoting *MacGregor*, 786 F.2d at 1053).

## III.   STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act's general disability insurance benefits (DIB) program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income (SSI) is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the

poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)–(C). However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled. *Patterson v. Bowen,* 799 F.2d 1455, 1456 n.1 (11th Cir. 1986). Applicants under DIB and SSI must prove "disability" within the meaning of the Social Security Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable to

> Engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010).

(1)    Is the person presently unemployed?

(2)    Is the person's impairment(s) severe?

> (3)     Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
>
> (4)     Is the person unable to perform his or her former occupation?
>
> (5)     Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen,* 800 F.2d 1026, 1030 (11th Cir. 1986).

The burden of proof rests on a claimant through Step 4. *See Phillips v. Barnhart*, 357 F.3d 1232, 1237–39 (11th Cir. 2004). Claimants establish a prima facie case of qualifying for disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id.*

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). *Id.* at 1238–39. The RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id.* It also can contain both exertional and non-exertional limitations. *Id.* at 1242–43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id.* at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines (grids) or hear testimony from a vocational expert (VE). *Id.* at 1239–40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job

experience. Each factor can independently limit the number of jobs realistically available to an individual. *Id.* at 1240. Combinations of these factors yield a statutorily required finding of disabled or not disabled. *Id.*

## IV.   ADMINISTRATIVE PROCEEDINGS

Whitehead was 56 years old at the time of the ALJ's decision. R. 31, 43. She lives in Elmore, Alabama, and is married but lives alone. R. 44, 700. She has a GED.[3] R. 44. Her primary complaints are left shoulder degenerative joint disease and major depressive disorder. R. 19, 46. In the past, Whitehead worked as a bus driver and an administrative assistant. R. 45.

Following an administrative hearing and employing the five-step process, the ALJ found at Step One that Plaintiff had not engaged in substantial gainful activity since August 29, 2016, the alleged onset date. R. 19. At Step Two, the ALJ found that Whitehead suffers from the following severe impairments under 20 C.F.R. § 416.920(c): obesity, mild cervical disc disease, mild left shoulder degenerative joint disease, history of attention deficit and hyperactivity disorder (ADHD), anxiety disorder with panic attacks, and major depressive disorder. R. 19. At Step Three, the ALJ determined that none of Whitehead's impairments or combination of impairments meets or medically equals the severity of an impairment listed in the applicable regulations. R. 20. The ALJ then articulated her RFC as follows:

> [T]he claimant has the residual functional capacity to perform a range of "medium work," as that term is otherwise defined in 20 CFR 404.1567(c).

---

[3] Other references in the record indicate that Plaintiff graduated from Luverne High School and attended but did not graduate from Troy University and Auburn University at Montgomery. R. 713.

Specifically, the claimant is able to lift and carry up to 50 pounds occasionally and up to 25 pounds frequently. She can push and pull within those same exertional limits. She can stand or walk for about 6 hours altogether and she can sit for at least 6 hours out of an 8-hour workday. She can frequently stoop, crouch, kneel, and climb ramps and stairs. She can perform tasks not requiring crawling or the climbing of ladders, ropes, or scaffolding. She can perform no more than occasional overhead reaching and can perform fine and gross manipulation on no greater than a frequent basis. She can perform tasks not involving the operation of vibrating tools or equipment. She can perform tasks not involving exposure to workplace hazards such as unprotected heights and dangerous moving machinery. Otherwise, the claimant can understand and carry out short, simple instructions consistent with the performance of simple, unskilled work of a routine, repetitive nature. She is able to make simple, work-related decisions, but she cannot carry out any complex instructions and cannot engage in any long-term planning, negotiation, or independent goal setting. She can tolerate occasional interaction with supervisors and co-workers and members of the general public. She can tolerate only minor, infrequent changes within the workplace.

R. 22.  At Step Four, having consulted with a VE, the ALJ concluded that Plaintiff has past work as a bus driver but that she is unable to perform past relevant work as actually or generally performed. R. 31. At Step Five, the ALJ concluded, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the she can perform. R. 31. Based upon the VE's testimony, the ALJ identified determined that the Plaintiff could perform the jobs of hand packager, hospital cleaner, and kitchen helper. R. 32. Accordingly, the ALJ concluded Plaintiff "has not been under a disability . . . from August 29, 2016, through the date of this decision" and denied her claim. R. 14, 32.

## V.   DISCUSSION

Plaintiff argues the ALJ erred by assigning substantial weight to the opinions of Dr. Robert Estock and Dr. Victoria Hogan, non-examining, non-treating, state agency

physicians; assigning substantial weight to Dr. Alan Babb, consultative examiner; and rejecting the opinion of Dr. Curry Hammack, consultative examiner.

### A.    Opinions of Dr. Estock and Dr. Hogan

Whitehead asserts that the ALJ erred in assigning "substantial weight" to the opinions of Dr. Estock and Dr. Hogan, who were non-examining, non-treating, state agency physicians, because they did not review the majority of medical evidence. Doc. 12 at 3. She states the medical evidence they considered was received no later than November 2016 (eighteen months before her May 2018 ALJ hearing).[4] *Id.*

Upon reviewing Whitehead's application and medical records submitted as of the date of their review, Drs. Estock and Hogan provided physical and mental RFC assessments. R. 81–94. Dr. Hogan provided the following physical limitations:[5]

- Exertional: Lift or carry 50 pounds occasionally and 25 pounds frequently; stand, walk, or stand about six hours in an eight-hour workday with normal breaks;

- Postural: Frequently climb ramps/stairs; never climb ladders/ropes/scaffolds; frequently stoop/kneel/crouch; occasionally crawl;

- Manipulative: Limited to frequent reaching overhead, bilaterally; and

- Environmental: No exposure to hazards such as machinery, heights, etc.

---

[4] The state agency physicians actually received medical records in December 2016, and those records included dates of treatment through October 2016. R. 79, 82–85.

[5] The state agencies physicians also provided their opinion on other limitations, but they determined Whitehead was not significantly limited by any of those limitations. R. 87–92.

R. 87–89. Dr. Hogan further noted that, although her application did not allege physical limitations, the medical evidence showed a history of cervical disc bulge with reduced range of motion and muscle tenderness. R. 90. However, she found that Whitehead's activities of daily living did not suggest any physical limitations. R. 90.

Dr. Estock provided the following mental limitations:

- Understanding and Memory: Moderately limited in ability to understand and remember detailed instructions;

- Sustained Concentration and Persistence: Moderately limited in ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination with or in proximity to others without being distracted by them, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

- Social Interaction: Moderately limited in ability to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and

- Adaptation: Not significantly limited in any category.

R. 90–92. Dr. Estock further found:

The claimant can understand, remember, and complete simple tasks. Concentration for detailed task would be limited at times by emotional factors. The claimant can maintain attention sufficiently to complete simple 1-to-2 step tasks for periods of at least 2 hours, without the need for special supervision or extra work breaks.

The claimant can maintain basic standards of personal hygiene and grooming. Claimant could complete an 8-hour workday, provided all customary breaks from work are given. The claimant would function best with a flexible daily schedule in a well-spaced work setting. The claimant can tolerate casual, non-intense interaction with member of the general public and coworkers. Supervision and criticism should be supportive and non-confrontational.

Claimant could tolerate ordinary work pressures but should avoid quick decision making, rapid changes, and multiple demands. Changes in the work environment and expectations should be infrequent, well explained, and introduced gradually in order to give the claimant time to adjust.

R. 92.

Drs. Hogan and Estock concluded that Whitehead would be limited to unskilled work and, based on the physical RFC, her "maximum sustained work capacity" was in the in the medium range. R. 93. They determined she could adjust to other work and cited three occupations in which there are a significant number of jobs that exist in the national economy: tire balancer, cleaner and preparer, and buffer. R. 92–93. They ultimately determined Plaintiff was not disabled. R. 93.

The ALJ noted that Dr. Estock found her mental impairments would "cause some moderate limitations in functioning" and that Dr. Hogan found her to be "limited to a range of medium exertion." R. 28. The ALJ found the opinions warranted substantial weight because they were consistent with the evidence as a whole. R. 28. Whitehead filed her Title II application for a period of disability and disability insurance benefits on September 15,

2016, alleging disability due to major depressive disorder and anxiety disorder beginning on August 29, 2016. At the hearing before the ALJ in May 2018, Whitehead amended her onset date to June 1, 2016, and alleged disability due to cervical disc disease and left shoulder degenerative joint disease. Thus, at the time Drs. Estock and Hogan reviewed her records, Whitehead's mental impairments were the only basis for her disability claim. Whitehead has failed to identify any records that exist and allegedly conflict with the doctors' opinions, but the ALJ, who conducted a thorough review of the medical evidence and provided a detailed summary in his decision, concluded that the opinions of Dr. Estock and Hogan were consistent with the medical records as a whole (R. 28).

### (1)   Medical Records for Treatment of Physical Impairments

Plaintiff's medical records for treatment before the review by Drs. Estock and Hogan show that she was seen at Neurosurgery & Spine Associates (N&SA) on June 30, 2016, following a motor vehicle accident on June 3, 2016. R. 23, 280. Whitehead had an MRI of her cervical spine due to reports of left shoulder pain. R. 280, 411. The MRI revealed "[m]inimal disc bulging at the C2-3 level and at the C4-5 level" with no other abnormalities or acute posttraumatic change seen. R. 280, 411–12.

Whitehead returned on July 13, 2016, reporting pain in her neck, arms and hands bilaterally, left shoulder, and lower back. R. 275. Whitehead rated the pain between 5 and 7 on a 10-point scale. R. 275, 286–89. Dr. Jeffry Pirofsky noted Whitehead was not in any acute distress, had a 30% decrease in her cervical spine range of motion, and had no "acute surgical abnormality at this time." He recommended physical therapy and cervical epidural, but she declined the injection. R. 276–77. Whitehead returned for a follow-up visit about

two weeks later and reported her pain level as a 6 on a 10-point scale. R. 272, 285. Reporting the same complaints, she also said she received only temporary relief after four physical therapy appointments, pain increased with activity, and she did not feel safe operating a school bus. R. 272. Dr. Pirofsky noted numbness in her right arm, weakness in her left arm, and a 40% decrease in cervical spine range of motion. R. 272–73. His assessment was cervicalgia, cervical disc degeneration, and spondylosis with radiculopathy. R. 273. Dr. Pirofsky concluded that four physical therapy visits were not enough to resolve her symptoms, prescribed Ultram for pain, and recommended that she continue physical therapy, receive a cervical epidural injection, and possibly have a nerve study in the future. R. 273.

On August 3, 2016, Dr. Pirofsky referred Whitehead to Center for Pain (CFP) for a neck pain consultation and cervical epidural steroid injection. R. 291–96. Whitehead reported that medication was effective for her pain but physical therapy was not. R. 291. Dr. Aaron Shinkle noted that she was in no acute distress but had a reduced range of motion and a positive Spurling's test for neck pain. R. 292–93. Dr. Shinkle administered a cervical epidural steroid injection, noting that Whitehead's pain level decreased from 7/10 pre-procedure to 5/10 post-procedure. R. 295. He instructed Whitehead to follow up in one month. R. 293.

Whitehead sought treatment for lower back pain in August 2016 from Autauga Medical Clinic (AMC), where she was already an established patient for lower back pain and various unrelated ailments. R. 316. Dr. Joe Howell noted that Whitehead had been in an motor vehicle accident in June and complained of "pinching lower back pain off and

on" with pain rated as moderate and a 7 on a 10-point scale. R. 317, 319. Dr. Howell also noted "mild cervical tenderness and muscle tightness" in her neck, muscle tightness and tenderness in her lower lumbar area, and "[g]ood strength and range of motion in her upper extremities." R. 318. Whitehead reported that physical therapy was not helping and that her lower back and neck pain were constant. R. 319. Dr. Howell prescribed Valium for muscle spasms and anxiety and Norco for pain, and her signed a 15-day work excuse. R. 319. He noted that she had been seeing her psychiatrist and therapist every three weeks. R. 319. Whitehead returned that same month and rated her pain level at a 5 on a 10-point scale. She also said she did not want another epidural injection because it was painful and did not help, that she was turning in her notice at work because she could not "deal with it anymore," and that she was applying for disability based on manic depression. R. 307–10. Dr. Howell refilled her Norco prescription, but no further treatment was discussed. R. 310.

On September 7, 2016, Whitehead sought treatment at AMC for a sore throat, but Dr. Howell still noted that her neck was supple, her trachea was midline, she had mild cervical tenderness and muscle tightness in her neck, and she had good strength and range of motion in her upper extremities. R. 300. Whitehead reported her upper back was still sore, and she was having pain under her left side ribs, causing tightness when she "stands, sits, or lays a certain way." R. 301. Dr. Howell did not find any discoloration on her left side chest wall but did note two small blood vessels that had burst, indicating a bruised area. R. 301. No treatment action was taken. On November 7, 2016, a left shoulder arthrogram was performed at Dr. Howell's request. R. 407. The report concluded that Whitehead's shoulder alignment was satisfactory with no fracture or contusion; however,

it showed a "subtle irregularity of the undersurface of the supraspinatus tendon suggestive of partial thickness tearing" but no "full thickness rotator cuff tear." R. 407.

The medical records for treatment of physical conditions after the state agency physicians' review are consistent with the records they reviewed. For example, on November 10, 2016, Whitehead visited Lemak Sports Medicine-Prattville with complaints of shoulder pain at a 7 on a 10-point scale. R. 476. Dr. Townes Leigh noted Whitehead's range of motion was within normal limits for her back and neck but that rotation to the left caused pain; her strength was 5/5 in all extremities except her left deltoid, which was 4+; her left shoulder had a reduced range of motion of 155 degree active flexion, 140 degree active abduction, and 30 degree active external rotation; and left shoulder strength on flexion, abduction, and rotation were between 4+ and 5-. R. 476–77. X-ray results showed normal alignment, no fractures, no glenohumeral joint space narrowing, no decreased AC joint space with osteophytes, and a normal soft tissue exam. R. 477, 479. Dr. Leigh's impression was rotator cuff tendinitis, and he recommended conservative management including counseling in-office, RICE protocol (rest, ice, compression, and elevation), a home exercise program, and returning for an MRI. R. 478.

On June 21, 2017, Whitehead was treated at AMC for moderate shoulder pain, which she rated as an 8 on a 10-point scale. R. 510–11. Dr. Lee Carter noted that she had a full but painful range of motion with 4 out of 5 strength in her left shoulder compared to her right. R. 512. He referred her to physical therapy and an evaluation by an orthopedist and advised her to alternate heat and ice in 15-minute intervals; he also prescribed Norco but withheld her Valium refill. R. 513.

On June 27, 2017, Whitehead returned to Lemak. Dr. Loren James noted that her left shoulder range of motion had improved to 160 degrees active flexion, 140 degrees active abduction, and 35 degrees active external rotation. R. 473. Dr. James kept Whitehead on the same conservative treatment, but she ordered an MRI because she suspected an incomplete rotator cuff tear or rupture or strain of the muscle, fascia, and tendon of the left triceps. R. 474. The MRI on June 30, 2017, showed small joint effusion, posterior subcutaneous edema, no significant marrow edema, and ligaments and tendons intact in her left elbow. R. 479. The MRI of the left shoulder showed mild degenerative changes of the AC and glenohumeral joint, infra and supraspinatus tendinopathy, small partial articular surface tear, small joint effusion, no definite labral tear, and the long head of the biceps tendon intact. R. 480.

On July 20, 2017, Whitehouse saw Dr. Carter at AMC again and described her pain as moderate but as a 7 on a 10-point scale. R. 520–21. Dr. Carter reviewed the previous MRI and referred her back to the orthopedist for evaluation and plan for care. R. 523.

Whitehead returned to AMC again in September, October, November, and December of 2017, but she expressed no complaints related to her shoulder. R. 530–70. At the October 3 appointment, she requested to be taken off Norco so she could be put back on Valium for muscle spasms and nerves. R. 543. Dr. Carter noted that the physical examination was unchanged. R. 543. On October 30, she was seen for a diabetes follow-up, and she reported that her pain was a 2 on a 10-point scale and "still tolerable with the current regimen." R. 553. In November, she reported her pain level at 0 out of 10. R. 561.

Finally, on December 28, she reported her pain level as a 3 on a 10-point scale and reiterated that her pain was still tolerable. R. 570.

### (2)    Medical Records for Treatment of Mental Impairments

Similarly, the medical evidence related to Whitehead's mental impairments was generally consistent before and after the state agency psychiatrist's review, with a hospitalization being the notable exception. For example, the records from before their review show that Whitehead was referred to Montgomery Psychiatry & Associates (MP&A) on May 17, 2016, by Dr. Howell due to complaints of depression. R. 380. As noted by the ALJ:

> There, the claimant told William Freeman, M.D., that she has been depressed for years. She subjectively reported scattered concentration, many panic attacks, and moderate mood swing and irritability. The claimant added she was currently treating for ADHD. Dr. Freeman felt the claimant had a good fund of knowledge and cognitive function, with an intact memory. He described her as pleasant. Dr. Freeman assessed the claimant has having major depressive disorder, recurrent, moderate, and ADHD, predominantly inattentive type. He prescribed 10 mg Ritalin. Dr. Freeman kept the claimant in outpatient treatment.

R. 25, 380–82. Additionally, Dr. Freeman recommended inflammation diets, routine exercise, and a sleep study, and he referred her to therapy. R. 382. At her June 8 visit, she reported that her condition was unchanged. R. 383. She rated her mood as a 3 on a 10-point scale and reported moderate irritability, easy distraction due to ADHD, and little change from the medicine. R. 383–85. The nurse practitioner adjusted her Ritalin dose. R. 385. In July 2016, her reports were mostly unchanged for both visits except she reported that she had crying spells and mild panic attacks and that therapy was helpful. R. 387, 389. The

nurse practitioner noted that Whitehead failed to increase her Ritalin dose as instructed, and she prescribed Klonopin and Lamictal. R. 388, 391.

In August 2016, Whitehead reported being in worse shape due to her brother's diagnosis of lung cancer and that she was unable to start Lamictal due to insurance issues. R. 392. The next month, she was "doing better" and said she had attempted to return to work for three days but was unable to continue. R. 395. The ALJ noted that "[o]bjectively, the claimant had good attention and concentration. Her thought process and content were logical. She had an appropriate affect." R. 24–25. Other than adding a prescription for Trazodone and increasing the dose of Lamotrigine, the nurse practitioner maintained her treatment as is. R. 396. The following month in October 2016, Whitehead reported doing very poorly following the death of her brother and failing to feel better on the then-current medication plan. R. 400. As the ALJ discussed, "[a]lthough she appeared sad, her attention was good, her mood and affect were appropriate, and her thought process and content were logical. Dr. Freeman added .5 mg Rexulti to her medication regimen." R. 25, 401.

After the review by Drs. Estock and Hogan, Whitehead continued treatment at MP&A through 2017 with minimal change in symptoms or treatment plan. In January 2017, she visited MP&A for medication management, and her subjective reports and treatment were unchanged except for an adjustment in Vyvanse dosage. R. 660–61. In March 2017, Whitehead reported that she was "doing so much better," her motivation and interests were good, her concentration and attention were better, and she had no more mood swings and crying spells; her treatment remained unchanged except for the addition of a

prescription for Klonopin. R. 657–58. Visits in May and August of 2017 revealed minimal change in symptoms or treatment. R. 651–55.

In October 2017, Whitehead reported having a setback with increased depressive symptoms and that she stayed in bed for three days without motivation or energy due to the anniversary of her brother's passing. R. 647. She reported that the combination of Abilify and Trintellix had been the best regimen for depression and anxiety symptoms; she also stated that she rarely used Klonopin due to over-sedation, and she did not notice much benefit from Ritalin and no longer endorsed ADHD symptoms. R. 647. She agreed to discontinue Klonopin and Ritalin. R. 647. Whitehead admitted having some morbid thoughts, but she had no suicidal ideations, was future oriented, and had clear reasons for living, including her family and her will to live. R. 647. As the ALJ noted:

> The claimant explained that she filed for disability based upon her car accident that left her with neck issues. She also shared that her favorite pastime is shopping. Dr. Osborne found the claimant presented without acute physical distress with appropriate hygiene and eye contact (Exhibit 14F/25). The claimant related appropriately in a polite and cooperative fashion. Her affect was mildly dysphoric appearing with noted tearfulness. The claimant was alert and oriented without evidence of gross cognitive impairment. Her intellectual functioning appeared average as evidenced by her breadth of vocabulary and fund of knowledge. The claimant's thought process was coherent, logical and goal directed. Her insight, judgment, and impulse control were all intact.

R. 26, 647–50. Whitehead received "dynamically supportive/cognitive oriented therapy" and medication adjustments, was scheduled for Genesight testing, and remained in outpatient care. R. 650.

Whitehead attended four appointments at MP&A between November 2017 and January 2018, at which she reported being content with her progress, including improved

Case 2:19-cv-00914-KFP   Document 16   Filed 03/09/21   Page 19 of 29

symptoms, resolution of morbid thoughts, feeling more productive and engaged socially, decreased crying, increased motivation, a "mildly improving" baseline, and improved mood and energy that was noticed by friends and family. R. 635, 643. The Genesight testing revealed that Whitehead is an ultra-rapid metabolizer of multiple medications, "possibly explaining her decreased response to medications in the past." R. 639. As a result, her Abilify dose was increased but later discontinued and replaced with Geodon in January because she felt some cognitive slowing; otherwise, there were no changes to her treatment plan. R. 631–32, 637–38, 642, 645–46.

On February 1, 2018, Whitehead was admitted to Crossbridge Behavioral Health at Baptist Medical Center South due to severe symptoms of depression, including suicidal ideations with an organized plan but no current intent. R. 579–81, 591. She reported that her medications were not currently helpful, she was feeling hopeless, her symptoms were functionally impairing, and that she could usually pull herself out of it but needed help this time.[6] R. 581, 591. In his discharge summary five days later, Dr. Joseph P. Lucas noted that Whitehead was "very sad very down and quite anxious." R. 588. During her stay, Dr. Lucas put Whitehead on Lexapro and Seroquel, reduced the dosage of Trintellix, and noted that she tolerated the adjustments with a "good response." R. 588. Dr. Lucas further reported that Whitehead had become less irritable, distressed, and anxious; showed a reduction in overall hopelessness and sadness; contracted for safety at the time of discharge; and agreed to attend follow-up therapy to learn more coping skills. R. 588.

---

[6] It should also be noted that Whitehead reported no back or joint pain, and the doctor reported a normal range of motion. R. 581, 583.

Following her hospitalization, Whitehead returned to MP&A twice in February 2018 and reported that she felt much improved; she also stated that Seroquel had been "somewhat effective for sleep and mood stabilization," but she requested an increase in dosage at each appointment. R. 625, 689. She inquired about a possible diagnosis for bipolar disorder, as suggested by her therapist, and said she had benefitted from the mood stabilizers she was prescribed. R. 626. Dr. Osborne stated she would monitor Plaintiff and may reconsider a bipolar diagnosis. R. 626. Whitehead's medications were adjusted as requested, but otherwise the treatment plan remained unchanged. R. 626–27, 690–91. The next month, Whitehead reported weight loss since beginning Seroquel and said the medication helped alleviate depressive symptoms without side effects. R. 684. She also reported no side effects from Trintellix and Valium. R. 684. She stated she experienced increased mood, increased goal-directed activity, decreased need for sleep, and grandiosity, all of which lasted a few days and were followed by depressive symptoms. R. 684. Dr. Osborne noted that these symptoms and her positive response to Seroquel may be representative of bipolar disorder. R. 684. She assessed Whitehead with bipolar disorder rather than major depressive disorder and increased her Seroquel dosage; all other treatment plans remained unchanged. R. 685–87.

Whitehead's final MP&A visit in the record occurred on April 24, 2018. She reported that Seroquel helped mood stabilization and that Trintellix had helped resolve some residual mood symptoms. R. 679. She further reported overall improvement as her stressors had lessened, but she was concerned that returning to work may increase her stress and cause decompensation. R. 679. The ALJ noted that:

> Upon evaluation, Dr. Osborne found the claimant presented without acute physical distress with appropriate hygiene and eye contact (Exhibit 16F/4). She related appropriately in a polite and cooperative fashion. There was no evidence of motor or speech abnormalities, and no evidence of attending to internal stimuli. Her affect was overall euthymic appearing with noted smiling. The claimant was alert and oriented without evidence of gross cognitive impairment. Her intellectual functioning appeared average as evidenced by her breadth of vocabulary and fund of knowledge. The claimant's thought process was coherent, logical and goal directed, and her thought content was without evidence of psychosis. The claimant's insight, judgment, and impulse control were all intact.

R. 26. All treatment plans remained unchanged. R. 680–81.

As the ALJ pointed out, in the second half of Whitehead's treatment at MP&A, they began noting her PHQ-9 depression questionnaires progression at each appointment, which showed the following progression from October 2017 through April 2018:

26 OCT 2017: 24 = severe distress
6 NOV 2017: 17 = moderately-severe distress with no critical items endorsed
16 NOV 2017: 11 = moderate distress with no critical items endorsed
7 DEC 2017: 15 = moderately-severe distress with no critical items endorsed
15 JAN 2018: 22 = severe distress with no critical items endorsed
9 FEB 2018: 8 = mild distress with no critical items endorsed
23 FEB 2018: 10 = moderate distress with no critical items endorsed
23 MAR 2018: 9 = mild distress with no critical items endorsed
24 APR 2018: 4 = mild distress with no critical items endorsed

R. 27, 682. Consistent with the medical evidence, the results show significant improvement over the course of Whitehead's treatment.

### (3)    The ALJ's Assessment of Dr. Estock's and Dr. Hogan's Opinions

The ALJ noted that Dr. Estock found Plaintiff's mental impairments would cause some moderate limitations in functioning and that Dr. Hogan found she would be limited to a range of medium exertion. R. 28. Because he determined these opinions were

consistent with the medical evidence as a whole, he assigned them substantial weight. R. 28.

Whitehead is correct that Drs. Estock and Hogan did not review all medical evidence from her examining physicians; however, when "a non-examining physician's assessment does not contradict the examining physician's report, the ALJ does not err in relying on the non-examining physician's report." *Davison v. Astrue*, 370 F. App'x 995, 997 (11th Cir. 2010) (citing *Edwards*, 937 F.2d at 584–85). As mentioned above, notably missing from Plaintiff's argument is *any* discussion about records that contradict or are inconsistent with the state agency physicians' opinions. *See Ezell v. Saul*, No. 4:20-CV-00067-MAF, 2020 WL 5731786, at *11 (N.D. Fla. Sept. 24, 2020) (finding that the significant weight the ALJ accorded to state agency physician's opinion was supported by the plaintiff's subsequent treatment records).

Further, "[e]ven if the state agency medical consultant cannot review all of the claimant's medical records before rendering an opinion or offering an RFC assessment, the ALJ has access to the entire record, including the claimant's testimony, and can determine whether the opinion is supported by and consistent with the evidence of record and thus whether to afford the opinion great weight." *Hwang v. Berryhill*, No. 8:18-CV-1096-T-27AEP, 2019 WL 2526719, at *4 (M.D. Fla. May 7, 2019), *report and recommendation adopted sub nom. Hwang v. Comm'r of Soc. Sec.*, 2019 WL 2524934 (M.D. Fla. June 19, 2019) (citing *Cooper v. Comm'r of Soc. Sec.*, 521 F. App'x 803, 807 (11th Cir. 2013) (finding that an ALJ did not afford undue weight to a non-examining doctor where the doctor cited several portions of the record to support her conclusions and the ALJ, who

makes the ultimate determination, had access to the entire record, including the claimant's testimony)). Here, the ALJ did not err in assigning substantial weight to the state agency physicians' opinions or finding that they were consistent with the medical evidence as a whole. Their "assessment was generally consistent with the examining physician[s'] [. . .] assessment," including the medical evidence beyond the date of their review. *Id.*; R. 81–90. The medical records demonstrate that treatment for Whitehead's physical and mental conditions has remained conservative, consisting primarily of medication management, and that her symptoms have improved over time. Thus, the ALJ's assignment of substantial weight to the opinions of Dr. Hogan and Dr. Estock is supported by substantial evidence. *See Wilkinson v. Comm'r of Soc. Sec.*, 289 F. App'x 384, 386 (11th Cir. 2008) ("The ALJ did not give undue weight to the opinion of the non-examining state agency physician because he did not rely solely on that opinion. . . . The ALJ considered the opinions of other treating, examining, and non-examining physicians; rehabilitation notes indicating improvement; and [the claimant's] own disability reports and testimony.").

### B.      Dr. Alan Bibb's Opinion

Plaintiff's next argument is that the opinion of Dr. Alan M. Babb is entitled to little or no weight because he "had no records to review[] and erroneously stated that Ms. Whitehead is not followed by any specialist." Doc. 12 at 3. This assertion misinterprets Dr. Babb's statements.

First, with respect to Dr. Babb's review of records, he actually stated that Whitehead "is followed by Dr. Osborne, a local psychiatrist, but I have none of her records to review." R. 700. Whitehead was referred to Dr. Babb for a *physical* consultative examination and to

Dr. Curry B. Hammack for a *psychological* consultative examination. Dr. Babb merely stated that he had no psychiatric records from MP&A to review for his physical consultative examination. Dr. Babb received the relevant medical records necessary for a physical consultative examination from DDS, reviewed them, and incorporated them into his assessment. R. 703. Whitehead's psychiatric records from MP&A were sent to and reviewed by Dr. Hammack for Whitehead's psychiatric consultative examination.

Second, with respect to Plaintiff's argument about being followed by a specialist, Dr. Babb noted that Whitehead "mentions a history of neck pain but is not followed by any neurosurgical or orthopedic specialist" and later stated that "[t]he only specialist she sees is her psychiatrist, Dr. Osborne." R. 700–01. Plaintiff claims she was being treated by an orthopedic surgeon for left rotator cuff tendinitis and rotator tear but that Dr. Babb did not consider these diagnoses, so his opinion that she can lift at the medium exertional level is unsupported by the medical evidence. Doc. 12 at 3. It is clear to the Court that Dr. Babb merely stated that Whitehead was not seeing an orthopedic specialist at the time of his examination on June 25, 2018. Whitehead had seen Dr. Osborne at MP&A but had not been under the care of an orthopedic specialist since she was treated at Lemak from November 2016 to June 2017. The record indicates no further appointments at Lemak or any other orthopedist office for an entire year before her visit with Dr. Babb. R. 473–80. Therefore, the Court finds that Dr. Babb correctly determined that Whitehead was not under the care of an orthopedic specialist at the time of his examination.

Finally, Plaintiff alleges that Dr. Babb failed to consider the records related to her left shoulder and lower back history. As previously mentioned, Dr. Babb stated that "the

medical record of evidence provided by the DDS was reviewed and those findings considered in the overall assessment of the patient." R. 703. Additionally, Dr. Babb noted Whitehead's subjective complaints at the time of the consultative examination. For example, Whitehead reported that she was unable to work due to "chronic depression and anxiety." R. 700. She also reported a history of neck pain and nerves. R. 700, 702. While there were no noted subjective complaints regarding her left shoulder and lower back pain, Dr. Babb conducted a full physical exam and found:

> Neck: Supple. No thyromegaly. There is a healed surgical scar just above the sternum. . . .

> Extremities: No clubbing or cyanosis. Peripheral pulses intact. No pitting edema noted.

> Musculoskeletal: She can abduct her shoulders about 130 degrees. She has normal flexion extension of the wrists and elbows and has normal dexterity of the hands. Anterior flexion of her back 100 degrees. Straight leg reflex 90 degrees. She has normal passive range of motion of the hips, knees, and ankles.

R. 701. Dr. Babb noted normal grip strength and dexterity and "no joint or back impairment except for the shoulders." Thus, Dr. Babb not only reviewed Whitehead's medical evidence of record, including her lower back and shoulder pain, but he considered her subjective complaints and noted his findings of a limited range of motion and pain in her shoulder.

As discussed above, the medical evidence indicates that Whitehead's pain significantly improved, and she reported that the pain became tolerable with her adjusted medication. For example, on November 30, 2017, Whitehead rated her pain at a 0, and on December 28, 2017, she rated it at a 3 and said it was "still tolerable on the current regime." R. 561, 570. During her February 2018 admission to Crossbridge Behavioral Health,

Whitehead rated her pain as a 0 on a 10-point scale, and the doctor noted a normal range of motion. R. 581, 583. Additionally, the record does not indicate any recommendation for surgical correction but, instead, reveals a conservative treatment plan involving physical therapy and medication management. Thus, the Court finds Dr. Babb's opinion, as well as the ALJ's reliance on the opinion, to be supported by substantial evidence.

### C.    Dr. Curry Hammack's Opinion

Plaintiff's last argument is that the ALJ's determination that she would have no more than moderate limitations in her ability to interact with others conflicts with Dr. Curry Hammack's opinion, which the ALJ assigned substantial weight. According to the Plaintiff, Dr. Hammack opined that she would be more than moderately impaired in a stressful situation like working, and the ALJ's failure to explain his reasons for rejecting this opinion is reversible error. Doc. 12 at 3–6. The Court finds, however, that the ALJ did not reject Dr. Hammack's opinion.

Dr. Hammack saw Plaintiff on June 19, 2018, for a psychiatric consultative examination. R. 712. After evaluating Whitehead and reviewing her medical evidence, he opined:

> It is felt that her mental health issues are quite problematic. They would probably interfere with her being able to relate to supervisory figures or the general public on at least a moderate level. She would tend to be easily frustrated. She would be susceptible to stressful situations. Her focus and concentration could also be moderately impacted.
>
> She is in need of continuing to receive outpatient mental health services and medication management.

R. 715. The ALJ discussed Dr. Hammack's opinions at length and found they were due

substantial weight because they were consistent with the evidence as a whole. R. 28, 30–

31. He then concluded:

> In interacting with others, the claimant has moderate limitations. Here, the
> claimant alleged that she has difficulty engaging in social activities and
> spending time in crowds (Exhibits 3E and 4E). However, according to her
> statements, the claimant is also able to get along with others, shop, spend
> time with friends and family, deal appropriately with authority, and live with
> others. In June 2018, the claimant was described as "cooperative, gracious,
> socially appropriate, and pleasant to work with" (Exhibit 19F). However, she
> reported she limits her interaction to family members.

R. 21. In his RFC assessment, the ALJ accounted for these limitations in finding that

Whitehead is "able to make simple, work-related decisions, but she cannot carry out any

complex instructions and cannot engage in any long-term planning, negotiation, or

independent goal setting. She can tolerate occasional interaction with supervisors and co-

workers and members of the general public. She can tolerate only minor, infrequent

changes within the workplace." R. 22. Thus, despite Plaintiff's insistence that Dr.

Hammack's opinion shows she would be "more than moderately impaired in a stressful

situation, such as working," this is an overstatement. He actually stated that her

impairments would "probably" interfere with her "ability to relate to supervisory figures

or the general public on at least a moderate level" and that she "would be susceptible to

stressful situations." R. 715. These statements do not translate into being "moderately

impaired" at work in general. Moreover, the ALJ's assessment--that that Plaintiff has

moderate limitations in interacting with others and can tolerate occasional interaction with

supervisors and co-workers and members of the general public--incorporates and is consistent with Dr. Hammack's opinion.

Even if the ALJ's assessment were inconsistent, the ALJ articulated the reasoning that supports his finding of moderate limitations in interacting with others (R. 21, 25–28, 30–31), and assessing a claimant's RFC at the administrative level is a responsibility solely reserved for the ALJ, not a physician. *See* 20 C.F.R. §§ 416.927(d)(2), 416.946(c). "To find that an ALJ's RFC determination is supported by substantial evidence, it must be shown that the ALJ has provided a sufficient rationale to link substantial record evidence to the conclusions reached." *Eaton v. Colvin*, 180 F. Supp. 3d 1037, 1055 (S.D. Ala. 2016) (citation and internal quotation marks omitted). Plaintiff essentially requests the Court to reweigh the evidence and conclude that her impairments exceed a moderate limitation in interacting with others and that she is "more than moderately impaired in . . . working." However, that is not the Court's role on appellate review. *See Moore v. Barnhart*, 405 F.3d 1208, 1213 (11th Cir. 2005) ("To the extent that [the plaintiff] points to other evidence which would undermine the ALJ's RFC determination, her contentions misinterpret the narrowly circumscribed nature of our appellate review, which precludes us from re-weighing the evidence or substituting our judgment for that of the Commissioner even if the evidence preponderates against the decision.") (internal quotations and footnotes omitted). After a thorough review of the record, the Court finds that substantial evidence supports the ALJ's findings and RFC assessment. The ALJ "properly carried out his regulatory role as an adjudicator responsible for assessing [Plaintiff's] RFC." *Castle v. Colvin*, 557 F. App'x 849, 853–54 (11th Cir. 2014).

## VI.    CONCLUSION

For the reasons stated above, the Court concludes that the Commissioner's decision is supported by substantial evidence and based on the proper legal standards. Accordingly, the decision of the Commissioner is AFFIRMED.

A final judgment will be entered separately.

DONE this 9th day of March, 2021.


/s/ Kelly Fitzgerald Pate
KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE